IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:19-CR-18 (MTT) |
| ) | |
| JOSE E. ORDAZ AVALOS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER

Defendant Jose E. Ordaz Avalos moves to suppress evidence obtained through a wiretap. Doc. 102. For the reasons that follow, Avalos' motion is **DENIED**.

### I. BACKGROUND

Avalos and six codefendants are charged with Conspiracy to Possess with Intent to Distribute more than 50 grams of methamphetamine.[1] Doc. 1. The evidence against Avalos and the others is based, in part, on information obtained through two wiretap orders on cell phones used by codefendant Albruce Green.

On May 30, 2018, the Court entered a wiretap order authorizing the recording of calls and texts occurring on (478) 250-2454 ("TT#1").[2] Doc. 118 at 4. Probable cause for the issuance of this wiretap order was based on recorded telephone calls and text messages from two confidential informants to this telephone number to set up the confidential informants' purchase of crystal methamphetamine. *Id.* Intercepts on TT#1 began on May 31, 2018 and concluded on June 28, 2018. *Id.* at 29.

---

[1] Avalos' six codefendants face various other charges as shown in the 15-count indictment. Doc. 1.

[2] Avalos does not challenge the wiretap order for TT#1.

On June 1, 2018, the Government learned that Green, as drug traffickers tend to do, was transitioning from TT#1 to another cell phone. *Id.* Specifically, a confidential informant told agents that he recently received another cell phone number for Green, (478) 733-4778 ("TT#2"). *Id.* TT#2 was subscribed to "Tim Jacksom," 737 Newbert Avenue, Macon, Georgia. *Id.* at 37. On July 31, 2018, the Government obtained a wiretap order authorizing the calls and texts occurring on TT#2.[3] Probable cause for this wiretap was provided by the affidavit of Larry Cole, a Drug Enforcement Agency Task Force Officer. *Id.* at 14. Cole's affidavit was based on information obtained from the wiretap of TT#1 and recorded telephone calls and text messages from a confidential informant to TT#2.[4] *Id.* at 4, 17-18, 32, 34-36. Intercepts over TT#2 began on August 1, 2018 and ended on August 28, 2018. Docs. 103 at 3; 133.

On August 3, 2018, a series of calls and texts were intercepted between TT#2 and Avalos' cell phone number, (678) 927-7308. Docs. 102 at 2; 116 at 4. The discussion involved the purchase of crystal methamphetamine for $5,000.00. *Id.* These intercepts were made pursuant to the July 31, 2018 wiretap order for TT#2.[5]

Avalos now moves to suppress the evidence obtained pursuant to the wiretap of TT#2. Doc. 102. First, Avalos argues that all evidence intercepted through the wiretap of TT#2 must be suppressed because Agent Cole's affidavit failed to establish the necessity for the wiretap as required by 18 U.S.C. § 2518(1)(c). *Id.* at 4-8. Second,

---

[3] Though both parties refer to the July 31, 2018 wiretap order, neither party put the order in the record. The Court has filed the July 31, 2018 wiretap order under seal at Doc. 132.

[4] Avalos does not dispute that probable cause existed for the wiretaps on TT#1 and TT#2. *See* Doc. 102.

[5] The Government does not dispute that Avalos is an "aggrieved person" who has standing to challenge the legality of the intercepted wire/oral communications obtained pursuant to the wiretap on TT#2. 18 U.S.C. § 2510(11).

-2-

Avalos argues that the Government did not minimize the recordings on TT#2 as required by 18 U.S.C. § 2518(5). *Id.* at 8-9. However, Avalos says he "has not received the minimization reports described by Agent Cole in his TT#2 affidavit" and thus he has filed "this initial motion to preserve the legal issue for future litigation and reserves the right to particularize this motion upon receipt of supplemental discovery and after an evidentiary hearing." *Id.* at 9. Avalos originally requested an evidentiary hearing on his motion as a whole, but he later withdrew the request.[6] *Id.* at. 10.

## II. MOTION TO SUPPRESS STANDARD OF REVIEW

Neither party discusses the appropriate standard of review, which here is somewhat nuanced. Generally, a defendant moving to suppress evidence seized pursuant to a warrant bears the initial burdens of production and persuasion. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (citations omitted).[7] "In passing on the validity of the warrant, consideration may be given only to information brought to the attention of the [issuing judge]." *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) (citations omitted). "Here, all of the evidence furnished to the [judge] is included in [Cole's] affidavit." *Id.* Thus, the Court looks within the four corners of Cole's affidavit to determine whether the requisite necessity for the wiretap existed. Notwithstanding his general, and now withdrawn, request for an evidentiary hearing, Avalos makes no effort to allege facts that would require a *Franks* hearing to resolve his challenge to the necessity for the wiretap. *Franks*, 438 U.S. at 155.

---

[6] Avalos did not expressly move for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). To be entitled to *Franks* hearing, a defendant must make a "substantial preliminary showing that a false statement knowing and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155.

[7] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981

Avalos' minimization challenge implicates a different standard of review. In "some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant." *de la Fuente*, 548 F.2d at 533. For example, if a defendant alleges evidence was seized in a warrantless search, the Government must justify the search and typically an evidentiary hearing is necessary. *Id.* Although the Court has found no Eleventh Circuit decision addressing the appropriate standard of review for a minimization challenge, by analogy it is apparent that, as in a challenge to a warrantless search, the Government bears the ultimate burden of establishing minimization. While Cole's affidavit acknowledges the need for minimization (Doc. 118 at 61-65), it obviously cannot discuss what the Government actually did to minimize the yet-to-be intercepted calls and texts. Clearly, evidence outside the four corners of the affidavit is needed to do that. Only the Government has that evidence, and the Government has the burden to produce it.

### III. NECESSITY

Avalos argues the Government's application did not establish necessity because (1) it failed to establish that other investigative techniques, such as pen registers, trash searches, grand jury or administrative subpoenas, witness interviews, and the execution of search and arrest warrants, were employed prior to seeking the wiretap for TT#2; and (2) the investigative techniques that law enforcement already employed were both effective to achieve the goals of the investigation without a wiretap and were not too dangerous to employ. Docs. 102; 125.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be

seized." U.S. Const. amend. IV. An order authorizing a wiretap must be supported by a an affidavit establishing not only probable cause but also the necessity for the order, shown with "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986).

Regarding necessity, "[s]ection 2518 does not 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted'; however, it does require the Government to show why alternative measures are inadequate for 'this particular investigation.'" *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (citations omitted). "The affidavit need not . . . show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *Van Horn*, 789 F.2d at 1496.

Avalos argues that "[b]ecause law enforcement failed to exhaust multiple investigative techniques capable of achieving the goals of the investigation (to wit: the arrest of Albruce Green and discovery of his methamphetamine source), the wiretap for TT#2 was not 'necessary.'" Doc. 102 at 6. Avalos states that law enforcement knew where Green lived, knew the location from which he sold methamphetamine (722 Newburg Avenue, Macon, Georgia), and had overwhelming evidence that Green sold narcotics to confidential informants and others. *Id.*; Doc. 125 at 2. He argues that this knowledge should have led law enforcement to execute arrest and search warrants at the Newburg Avenue address. Doc. 102 at 6.

Avalos overlooks, however, that the objectives of the investigation were broader than arresting Green and discovering his methamphetamine source. Special Agent

Cole described the objectives as:

> Identifying local wholesale distributors and members of their organization, determining the breadth of the Middle Georgia-based organization's operations, their method of acquisition and distribution of narcotics, specifically methamphetamine, the identity of their associates and co-conspirators, the nature and scope of their illegal activities, the relationship between financiers, transporters, supplies, and distributors of the controlled substances, and the collection and distribution of monies which stem from the illegal drug activities and/or finance the illegal drug activities.

Doc. 118 at 43-44. Cole acknowledged that law enforcement "had gained evidence regarding portions of the activities of some of [Green's] distribution network," but had not "been able to identify the full scope of their activities, or even the identities of all the members of the Middle Georgia-based organization." *Id.* at 44. The wiretap of TT#2 was, therefore, necessary "to identify the members of the Middle Georgia-based organization along with the sources of supply in Georgia." *Id.* Furthermore, the wiretap of TT#2 was needed to help law enforcement "obtain a clear understanding of the drug trafficking activities of the Middle Georgia-based organization . . . as well as [to provide] the best opportunity to identify the transportation and distribution routes, and persons that are participating in and facilitating the criminal activities of the organization." *Id.* at 44-45.

Cole states in his affidavit that he considered using other investigative techniques, including arrest and search warrants, but found they were insufficient in light of the investigative goals. Cole stated that "[s]eeking arrest warrants at this time would be premature." *Id.* at 55. He explained that he did not know whether the then-known participants in the criminal enterprise would, if arrested, "cooperate and provide information without 'tipping-off' their co-conspirators." *Id.* Thus, contact with or arrest of "active members of the Middle Georgia-based organization could . . . compromise the entire investigation absent some degree of confidentiality." *Id.*

Regarding search warrants, Cole stated

> the use of search warrants is unlikely to produce sufficient evidence to determine the full nature and scope of the criminal conspiracy, the identity of all participants, or/or their method of operations. Execution of search warrants would also "tip off" targets of the investigation, causing them to curtail or conceal their activities and bring the investigation to an unsuccessful and premature conclusion. Furthermore, law enforcement has only identified four or five members of the Middle Georgia-based organization and has not yet identified all of the locations that they use for storage/distribution of drug[s] and drug proceeds within the Middle District of Georgia. Based on the foregoing, your Affiant believes that it would be more productive to execute search warrants at the conclusion of this investigation, once these locations have been established and the other goals of the investigation have been successfully achieved.

*Id.* at 55-56.

Cole testified that not only did law enforcement consider search and arrest warrants, they considered, and rejected, other alternative investigative techniques, including grand jury and administrative subpoenas, interviews of witnesses and/or known members of the criminal enterprise, trash searches, and pen registers. *Id.* at 45-60. Cole explained why these methods were unlikely to succeed. *Id.* For example, the use of grand jury subpoenas at that time would be unsuccessful because not all members of the Middle Georgia-based organization were known; those that were known might be uncooperative and refuse to testify; immunity would not ensure truthful testimony; and service of grand jury subpoenas would alert the co-conspirators to the investigation, causing them to become more cautious in their activities, flee to avoid prosecution, or threaten the lives of informants. *Id.* at 50-51. Cole stated that interviews of witnesses, cooperating persons, or the target subjects were not likely to be successful and conducting such would run the risk of compromising the entire investigation. *Id.* at 54-55. Regarding trash searches, Cole stated that law enforcement never saw any trash cans on the grounds of the residence at 722 Newburg Avenue. *Id.* at 57. Also, there were no individual trash cans at Green's residence on 3896 Riverside

Drive, which is an apartment complex. *Id.* All of the residents throw their trash into a large dumpster, and law enforcement would have no way of knowing which garbage in the dumpster belonged to Green. *Id.* Finally, Cole stated that pen registers were not used "as an investigative technique due to the speed with which Verizon Wireless . . . returned requested toll information to him." *Id.* at 50

Given the detailed information in Cole's affidavit, Avalos cannot prevail on his argument that the Government failed to establish that other investigative techniques should have been employed prior to seeking a wiretap order for TT#2. Again, the Government does not need to show a "comprehensive exhaustion of all possible investigative techniques." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 (11th Cir. 2010); *see also United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984). Rather, as the Government did here, it need only state with specificity why other investigative methods not yet used would fail and thus were not attempted. *United States v. Giordano*, 416 U.S. 505, 515 (1974); *United States v. Dennis*, 786 F.2d 1029, 1035 (11th Cir. 1986); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978) (stating that "courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not"). Cole adequately explained why the investigative methods not undertaken were not likely to succeed. *Van Horn*, 789 F.2d at 1496.

Avalos' second argument—that the investigative techniques that law enforcement already employed were both effective to achieve the goals of the investigation without a wiretap and were not too dangerous to employ—is also foreclosed by Cole's affidavit. Avalos argues that a wiretap of TT#2 was unnecessary because the investigative techniques already undertaken showed (1) that Green was distributing narcotics at 722 Newburg Avenue, (2) the frequency of the transactions, (3)

the individuals who were coming to and from Newberg Avenue, and (4) one of Green's potential suppliers. Doc. 125 at 3. But Cole's affidavit established that the investigative techniques already used enabled law enforcement to identify some of the drug organizations' member, but others remained unidentified. Doc. 118 at 44-45. Similarly, while one "possible source of supply of drugs" had been discovered, there remained an "unknown source of supply for narcotics, specifically methamphetamine and cocaine." *Id.* at 45.

Cole stated that law enforcement attempted several methods of investigation prior to obtaining the wiretap for TT#2, including physical surveillance, toll analysis, use of confidential sources, undercover agents, consensual recordings, pole cameras, tracking devices, financial investigations, use of geolocation/E911 data, controlled purchases, historical text message review, and a previous wiretap of TT#1. Doc. 118 at 45-60. Cole acknowledged these methods led to the Government gaining some valuable evidence. *Id.* But Cole also stated that, although partially successful, these investigative methods would be inadequate for the goals of this particular investigation. *Id.*; *see Perez*, 661 F.3d at 581 (citation omitted) ("The partial success of alternative investigative measures . . . does not necessarily render electronic surveillance unnecessary.").

Cole provided details regarding the limitations of each method that law enforcement used. Doc. 118 at 45-60. First, Cole testified that, although it had been used with limited success, physical surveillance was difficult given the neighborhood surrounding 722 Newberg Avenue. *Id.* at 46. "Cars and individuals that are unknown stand out in this area and risk compromising themselves and the investigation." *Id.* Green often used "look-outs," and he often quickly became aware of police presence in the area. *Id.* at 4. Also, Green routinely had individuals who were purchasing

methamphetamine park in the back of the residence, which made physical surveillance difficult. *Id.* at 48. While physical surveillance would continue when feasible, Cole stated that it would not provide sufficient evidence to meet the goals of the investigation. *Id.*

Cole stated that toll information had been used in the investigation and its use would continue. *Id.* at 49. But, the analysis of toll information has limitations: law enforcement cannot identify target subjects or other suspects using toll analysis; those engaged in criminal activity often use cell phones subscribed to others or use cell phones with false information or no subscriber information; and, importantly, toll information cannot "reveal the inner workings of the drug trafficking organization, their members, methods of transportation, [or] sources of supply." *Id.*

Law enforcement had also used four confidential sources and two cooperating defendants. *Id.* at 51. But the use of these individuals had not proven to be an effective alternative to wiretaps. Specifically, they were able to provide only limited information about the drug organization or its day-to-day workings; they established only a buyer relationship with Green;[8] other than Green, they could only identify lower-level members of the organization; two confidential sources were no long cooperating with law enforcement; and one cooperating defendant was incarcerated and could no longer provide information *Id.* at 52. The confidential sources and cooperating defendants simply could not help law enforcement identify multiple sources and customers who were conspiring with Green to possess and distribute narcotics. *Id.*

An undercover agent was used, but his role was limited due to the close-knit

---

[8] The confidential sources did make six controlled purchases of methamphetamine from Green. *Id.* at 58. But controlled purchases did not provide access to Green's other customers or to his source of supply. *Id.* at 59.

-10-

relationship of the members of the organization and his inability to penetrate the upper-levels of the organizations. *Id.* Most members of the drug organization only dealt with long-time associates and, therefore, the undercover agent was unable to purchase narcotics from Green or learn the inner-working of the organization. *Id.* at 54. Because Green closely guarded the identity of his methamphetamine suppliers, the undercover agent would have no way of learning this information. *Id.*

Law enforcement had also utilized consensual recordings, which provided valuable intelligence regarding the purchase of narcotics. *Id.* But simply recording a conversation with Green could not identify Green's source of supply or provide any information regarding other customers. Thus, consensual recording had limited value compared to intercepted calls or texts through a wiretap. *Id.* Similarly, the review of historical texts, which law enforcement did undertake, could not provide "real time information" or identify all of Green's co-conspirators, suppliers, or the location of stash houses. *Id.* at 59.

Law enforcement had obtained real time/GPS information for TT#1, and this information confirmed that Green travelled to 722 Newberg Avenue almost every day. *Id.* at 58. Cole stated that geolocation data as to TT#2 was necessary to show law enforcement where drug deals were taking place. *Id.* Such information would allow law enforcement "to obtain evidence of the deal to include: identification of all participants, seizures, photographs, video, vehicle descriptions and registrations, [and] addresses for search warrants." *Id.*

While an installed pole camera allowed a limited view of the front of 722 Newburg Avenue, there was no way for such a camera to provide a view of the rear of the premises. *Id.* at 56. "The rear of the residence is where most purchasers of methamphetamine enter it to meet with Green." *Id.* Plus, law enforcement had limited

success identifying the vehicles that the pole camera captured coming and going from the residence. *Id.*

Cole testified that law enforcement had installed a tracking device on Green's vehicle. *Id.* at 55. Information from the device showed Green travelled to 722 Newburg Avenue every day. *Id.* Although the tracking device allowed law enforcement to identify the location of Green's travels, the device could not provide information regarding the inner-workings of the drug organization. *Id.* at 56-57.

Cole stated that he had conducted a financial investigation of the drug organization. *Id.* at 57. While the financial investigation was on-going, it revealed little. Green owned no real property, the car he drove was registered to someone else, Green was not an officer or registered agent of any corporation, and Green had no employment history. *Id.*

Thus, Cole's affidavit showed that law enforcement used a variety of investigative techniques. But, contrary to Avalos' arguments, Cole's affidavit established that these techniques, without a wiretap of TT#2, were not effective to achieve the goals of the investigation.

In sum, the Government, through Cole's testimony, established the "prospective failure of several investigative techniques that reasonably suggest[ed] themselves." *Van Horn*, 789 F.2d at 1496. Moreover, because the Government also established that investigative techniques used prior to the application failed to achieve the goals of this investigation, the application and affidavit sufficiently established the necessity for the July 31, 2018 wiretap order.

## IV. MINIMIZATION

18 U.S.C. § 2518(5) provides that every wiretap order must have a provision that interception "shall be conducted in such a way as to minimize the interception of

communications not otherwise subject to interception. . . ." This "statute[] require[s] that the intrusions of the privacy of those whose communications are intercepted . . . be held to a minimum (consistently with the purposes of the wiretap)." *Hyde*, 574 F.2d at 869. Only if the "minimization requirement is blatantly disregarded," will the information obtained through the wiretap be suppressed. *Id.* (citation omitted).

Avalos makes only a general allegation that "[t]he agents failed to minimize the intrusion on" TT#2. Doc. 102 at 8-10. Although Avalos says he did not have evidence of the Government's minimization efforts when he filed his motion, he did have, the Court assumes, the recorded calls, and he does not claim that any specific call should have been minimized. Instead, he states that because he "has not received in discovery the minimization reports described by Agent Cole in his . . . affidavit," he filed his "initial motion to preserve the legal issue for future litigation and reserves the right to particularize this motion upon receipt of the supplemental discovery and after an evidentiary hearing."[9] *Id.* at 9 (citing Doc. 118 at 61).

In response, the Government states that "[t]here is no such document. What Avalos terms [a] minimization report is actually the internal minimization memo used by the prosecutor to instruct the monitors before the intercepts begin." Doc. 103 at 16. The Government attached as Exhibit A to its response brief a copy of the minimization memo, entitled "Instructions for Wire Interceptions." Doc. 103-1. The Government also states that it "submitted a 15-day report to the court which listed the number of calls made over TT#2, and the number of those calls which were minimized." Doc. 103 at 15 (citing First Report to the Court, August 16, 2018).[10]

---

[9] As stated previously, Avalos withdrew his request for an evidentiary hearing.

[10] Though the Government cites the August 16, 2018 First Report to the Court, it did not put the document in the record. The Government did submit the First Report to the Court in 5:18-mj-43

-13-

In his reply brief, Avalos does not challenge the Government's minimization efforts. Indeed, he does not mention minimization. Nor did he renew his request for an evidentiary hearing. Presumably, now that Avalos has details of the Government's minimization efforts, his concerns have been alleviated. If not, it is up to Avalos to "particularize []his motion" with specific information regarding what non-pertinent calls he believes the Government failed to minimize. Doc. 118 at 9.

Based on the record and absent any specific minimization challenge by Avalos, the Court is satisfied that the Government made reasonable efforts to minimize the intrusion on TT#2. Avalos' conclusory allegation, without more, certainly does not show the Government "blatantly disregarded" the minimization requirement. *Hyde*, 574 F.2d at 869.

## V. GOOD FAITH EXCEPTION

The good faith exception to the Fourth Amendment exclusionary rule applies to wiretap applications and orders. *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988) (finding evidence should not be suppressed because "[t]he record shows that the [wiretap] application was devoid of deliberately false or recklessly false information that would provide a sufficient basis to apply the [exclusionary] rule"). Under the good faith exception, the Court will not suppress evidence obtained pursuant to a warrant unless (1) the issuing judge was knowingly misled by information the affiant knew, or should have known, was false; (2) the issuing judge "wholly abandoned his judicial role;" (3) the application was so lacking indicia of probable cause as to render

---

at Docs. 12; 12-1. The Court is filing under seal in this criminal docket a copy of the August 16, 2018 First Report to the Court. See Doc.133. The Court assumes all 15-day reports have been produced in discovery.

reliance upon it unreasonable; or (4) the warrant was so facially deficient that reliance upon it was unreasonable. *United States v. Leon*, 468 U.S. 897, 923 (1984).

Avalos presents nothing to suggest that the good faith exception would not apply in this case. Thus, even if errors were made in the issuance of the wiretap order for TT#2, which the Court does not find, the good faith exception would apply and no evidence would be excluded.

## VI. CONCLUSION

For the reasons stated herein, Avalos's motion to suppress (Doc. 102) is **DENIED**.

**SO ORDERED,** this 23rd day of December, 2019.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT